The Judges delivered their opinions.*
Judge Caiir,
. « . This is a most important ease, both for the amount of money, and the principles of law, involved in it; and it was argued with all the zeal, ability and research, which its importance merited. It is a suit by the Bank against Stribbling, on a promissory note for $S,800, payable at sixty days to Fr. Stribbiing, or order, negotiable and payable at the Bank. There are six endorsers; and the last directs that the note be credited to the drawer. It was discounted at the Bank; protested for non-payment; and the maker sued. The declaration sets out the particulars of the case. The defendant., 1st, demurred generally to the declaration, and on argument the demurrer was overruled. 2d. He filed a special plea of usury, to which there was a replication and issue. 3d. He pleaded Nil Debet, and issue. 4th. Ano-> then special plea of usury, to which there was a demurrer. The Court thought the plea bad; but gave leave to amend, by adding the scienter. Thus amended, the Court received the plea. The plaintiff excepted to the opinion of the Court giving leave to amend, and took issue on the plea. The defendant filed another special plea of usury to the following effect: that before the making of the note, to wit, on the 14th day of February, 1821, at, Sic. it was corruptly, and against the form of the Acts of Assembly, &jc. agreed between the Bank and the said Stribbiing, that the Bank would discount for him two notes, one for §10,000, the other for §2,500, and would continue the said discount for eighteen months, provided Stribbiing (and several others named) should be made drawers, and the notes should be endorsed by Sigismond Stribbiing; the notes to be renewed every sixty days, and the discount to be paid thereon, to wit, interest in advance at the rate of one *137 half of one per cent, for every thirty days; and provid» ed that the said Stribhling would take in payment of the said discount, one hundred shares of stock of tho Bank at E$ 10,000, and the rest in money. Tho plea then states tho giving and discounting the notes, with their various renewals; the receipt of the shares at par, &c.; all in execution and continuation of the corrupt agreement; and concludes with an averment, that at the original discounting, and at each renewal of the notes, there was uniformly paid in advance by Stribhling to the Bank, in execution of the said corrupt and unlawful agreement, a discount upon the notes, at the rate of one half of one per cent, for every thirty days; and he-avers that the discount and interest contracted to be paid, and actually paid, by him to the Bank, at the renewal of the said notes, every sixty-days, exceeds the rate of $6 for the forbearance and giving day of payment, of $ 100 for one year; contrary to the Act of tho General Assembly in that case made and provided; by means whereof, and by force of the said Acts of the General Assembly, the said last mentioned promissory note was, and is, void in law, and this, Sic. To this plea there was a general demurrer, which the Court sustained.
The issues of fact were then tried by a jury, and all found for the plaintiffs; on which verdict, the Court rendered judgment.
In the progress of the trial, three exceptions to the opinion of the Court were taken; which will be further noticed hereafter, as also an exception to the opinion of the Court overruling a motion for a new trial. The demurrers to the declaration, and the last plea, were placed by the counsel for the defendant on the same ground, to wit, that the case disclosed by each was a caso of pure loan, and therefore that the interest taken in advance was usurious. Before, however, deciding this question, it may be best to discuss some preliminary points raised at the bar.
It was contended by the plaintiff’s counsel; First, That no corporations are embraced by the statute $£ usury. *138 Secondly, That if it extend to other corporations, it does not to this Bank, it being, by the law of its creation, set above the general law of usury. To meet, or rather to forestall these enquiries, it is insisted on the other side, jq,at ]aw creating the Bank, is a private statute, and not being set out in the pleadings, cannot be noticed by the Court, in deciding these demurrers. This last point must be first disposed of. The distinction between' public and private Acts, is unquestionably a doctrine of the common law; but, as I must say that it seems to me to be founded much more in technical and artificial reasoning than in good sense, I do not feel inclined to carry it beyond the strict letter. Most of the old books abound with cases turning on this doctrine. Many illustrations of the distinction between public and private Acts, are given in Holland’s Case, 4 Co. Rep. 76. But, I have seen the subject no where treated with more clearness and precision, than in the note to 6 Bac. Abr. 374, tit. Statute, F. said to be from the pen of Mr. Mbott. “ Acts are deemed to be public and general Acts, which the Judges will take notice of without pleading, to wit, Acts concerning the King, the Queen, and the Prince; those concerning all prelates, nobles, and great officers; those concerning the whole spirituality; and those which concern all officers in general, such as all sheriffs, 8tc.; Acts concerning trade in general, or any specific trade; Acts concerning all persons generally, though it be a special or particular thing, such as a statute concerning assizes, or woods in forests, chases, &c. &c. Com. Dig. tit. Parliament, (R. 6.) 2d. Private Acts are those, which concern only a particular species, thing or person; of which the Judges will not take notice, without pleading them, viz. Acts relating to the bishops only, Acts for toleration of dissenters, Acts relating to any particular place, or to divers particular towns, or to one or divers particular counties, or to colleges only in the universities. Com. Dig. tit. Parliament, (R. 7.) 3d. In a general Act, there may be a private clause, (Ibid.) and a *139 private Act, if recognized by a public Act, must afterwards be noticed by the Courts as such.” (2 Term Rep. 567.) To this last point, there are many authorities. Buli.mii, in his Nisi Prius, 224, says, that though it be regularly true, that a private law shall not be taken notice of unless it bs shewn; yet it will be otherwise, in case such private law be recognized by a public one. In Samuel v. Evans, 2 Term Rep. 574, Ashhurst, Justice, speaking of the statute of 23d Hen. 6, empowering sheriffs to take bail bonds, gays, “on the reason of the thing, the statute is a general iaw; for, though it relates to officers of a certain description, yet all the King’s subjects are included in it; for it gives to ail of them a liberty of being bailed. But, whatever doubt there might have been before the passing of the statute of Ann, it is now removed by that statute, which unquestionably makes it a public law.” Buller, J. in the same case, speaking of the 23d Hen. 6, says, “But the point is not now open to consideration; for, whatever might have been the law before the statute of Ann, the case of Saxhy v. Kirby, removes all doubt. The Court there said, that though the 23d Hen. 6, were a private law, yet the statute of Ann having enabled the sheriff' to assign such bond, the Court must take notice of the law that enables him to take such bond.” Whether our laws creating Banks are intrinsically private Acts, is matter of great doubt with me. They, to be sure, may be said in some respects to concern the particular stockholders who compose the corporation; but, in other respects, all the citizens arc interested in them. The Commonwealth has a large interest in them, and by her power of appointing officers, has, in a great degree, the control of them. The cashier is by the law directed semi annually 1o furnish to the Executive, statements on oath, shewing the whole situation of the Bank, which it is made the duty of the Executive to com» municate to the Legislature. He is also empowered to send an agent to inspect the books of the Bank, and count the specie. Our laws also make it felony to counterfeit *140 their notes. All these things give them rather the aspect of great public institutions, than private companies. In Young v. The Bank of Alexandria, 4 Cranch, 388, counwho were discussing the question whether the law of Virginia establishing the Bank of Alexandria, was a public Act, were stopped by the Court. Chase, J. said, “The Act makes it felony to counterfeit the notes of this Bank. Does not that make it a public Act ?” Marshall, C. J. said, “that the opinion of the Court was very strong that this was a public Act; and that if it were not, it being printed by the public printer, by order of the Legislature, agreeably to a general Act of Assembly for that purpose, it must be considered sufficiently authenticated.” From all this, I rather incline to think, that these Bank laws are of themselves public laws; but if not, I am well satisfied that they have been made so, by the recognition frequently given them by public laws. All our revisáis (since Banks were among us,) direct the publication of the laws creating them, as public laws; the revisal of 1819, especially. It gives a list of the general laws to be published; and the Bank laws are among these; then it directs that all private, local, and temporary Acts, shall have their titles only published. I am of opinion, that the Court are bound to notice this law, though not set out in the pleadings.
We come now to the question, are corporations included within the Statute of Usury ? Can they take usury ad li~ bitum ? It is contended, 1st, that they are not within the words of the law; 2nd, that they are not within the mischief.
The first objection that occurs to this point, is its novelty. I have never heard, nor have I been able to find in any book, a question of this kind raised; and yet the case must have occurred frequently. We see many decisions in the New York, and Massachusetts cases, where the contracts of Banks have been pronounced usurious. These cases called forth the very best talents of the State, and were, some of them, most ably argued; and yet, this objection *141 never occurred. In the Federal Court, cases have been de» cided between the U. S. Bank and its debtors, in which the question of usury has arisen; but it was never contended, that a corporation could not commit usury. I refer particularly to the ease of Fleckner v. U. S. Bank, 8 Wheat. 338. I mention this merely as a prima facia objection to the point. It is certain, that although never made till now, it may he sound; and the professional standing of the counsel who made it, as well as the ability with which it was supported, require that it should be se - riously weighed.
The first section of the law directs, that no person shall, upon any contract, take directly or indirectly, for loan of any money, &rc. more than six per cent, for a year, fee. The second section says, “ If any person shall, by any way or means, &c. take more than six percent, every person so offending shall forfeit double,” &c. These sections, it is said, shew that none but persons can commit usury, and that a corporation is not a person. That a corporation is not a natural person, is most clear. Whether they may not sometimes be comprehended in law, by that term, I have not formed an opinion. Some pretty strong cases to that effect were cited at the bar; and if this were an attempt to inflict the penalties of the statute, we should have to decide that point. But the question is, whether a contract made by a corporation, contrary to the statute, is not void; and this, I think, is clearly decided by the last clause of the first section, which enacts, that “all bonds, contracts, covenants, conveyances or assurances, to be made for payment or delivery of any money or goods so to be lent, on which a higher interest is reserved or taken than is hereby allowed, shall be utterly void.” These words seem to me to include every contract that can be made. The words of the law, therefore, take in the case.
But. it is said, that corporations are not within the mischief of the law, or its meaning. The mischief of the law, was taking usury. Cannot corporations make usurious *142 contracts ? Unquestionably. The power of buying and selling, granting and taking, Sic. is generally given expressly by their charters, and if it were not, would result as an incident to their creation. 10 Rep. 29, 30. My Lord Coke says, “When a corporation is duly created, all other incidents are tacite annexed;” among which he mentions the power to sue and be sued, implead and be impleaded, grant and purchase, and many others.
But it is said, that Banks are the depositories of the property of the subscribers, for whom the officers are mere trustees: that the rights of widows, orphans and infants are committed to them; and the law could never intend, that these interests should be sacrificed by their mismanagement or dishonesty. I cannot agree to this position. In the very nature of things, all who commit their interests to the keeping and management of others, must depend, for gain or loss, on the skill and fidelity of the fiduciary. Suppose the officers lose money by bad debts. Suppose they embezzle it. Must not the stockholders suffer ? And why not, if they make a contract violating the usury law, and thereby create a bad debt ? This is no greater loss than if the same money were lent to an insolvent man. The doctrine would extend to all trustees of every description, (a thing never thought of,) or you must say that this is a privilege peculiar to Banks.
But, it is said, secondly, that this Bank is placed above the law of usury by its own law, which permits it to take one half of one per cent, for every 30 days. The words of the law are, “ neither shall the said corporation take more than the rate of one half of one per centum for 30 days, for or on account of its loans or discounts.” It is contended, that this is a total repeal of the usury law, so far as relates to the Bank;-and that though they take 20 per cent, a month, no consequence can result from it, but the loss of their charter under their own law. I take it very differently. The power given to the Bank to take one half of one per cent, for 30 days, I consider a parti *143 «alar privilege, which, while they keep within it, protects them from the action of the usury law, but no longer. The moment they exceed the privilege, the shield is gone, and the general law operates. I can have no idea that a total repeal of the usury law was intended. Surely, if it had, there would have been something in the Bank law more clearly expressing it. There is certainly no express repeal. Implied repeals, we know, are not favoured in law. There must be absolute repugnancy to effect it. If the laws can be made to stand together; especially if there be different functions for the laws, the one a general, the other a particular purpose; the latter will never be construed to repeal the former. For this doctrine, many cases might be cited. 1 shall only refer to Warder v. Arrell, 2 Wash. 282. I believe the only intention of the Act, was to make that law, which was known to be me practice. In Banking operations, it is much the most convenient and ready to take the year to consist of 360 days; and this had become a general practice in all Banks, (attended with very mischievous consequences to many of them, as we see by the New-York cases.) Our Legislature meant to give this Bank the benefit of this practice, without subjecting it to the charge of usury.
I am dear, therefore, that corporations, generally, are within the usury law; and that this Bank is not, by its charter exempted, further than the privilege of taking one half of one per cent, for SO days, extends.
Let us now consider the demurrers and plea; and as they are both placed on the same ground, it will only be necessary to consider one. We will take the plea. The contract stated by it, is an agreement to discount the notes for eighteen months, renewable for every sixty clays, deduct’ ing in ad vance the discount of one halfper cent, for 30 days, at every renewal, and paying in part discount 100 shares at $10,000: and it is averred that the discount and interest contracted to be paid, and actually paid, at the renewals, exceeded six per cent, contrary to the Act of Assembly. *144 fee. The whole charge here is, that the taking interest in advance amounted to more than six per cent, and constituted usury.
Upon two grounds, I think this plea bad, and the demurrer properly sustained. 1st. It is perfectly settled by the cases, that in commercial and banking transaetions, it is not usury to take interest in advance on discounts or loans. This is very clearly laid down in Fleckner v. United States’ Bank, 8 Wheat. 338. The Judge says, “The next point in the record, is, whether the discount taken in this case was usurious. It is not pretended that interest was deducted for a greater length of time than the note had to run, or for more than at the rate of 6per cent. on the sum due by the note. The sole objection is the deduction of the interest from the amount of the note, at the time it was discounted* and this, it is said, gives the Bank at the rate of more than 6 per cent, upon the sum actually-carried to the credit of the P. Bank. If a transaction of this sort is to be deemed usurious, the same principle must apply with equal force to Bank discounts generally; for, the practice is believed to be universal; and probably few, if any charters, contain an express provision authorising, in terms, the deduction of the interest in advance, upon making loans or discounts. It has always been supposed, that an authority to discount, or make discounts, did from the very force of the terms, necessarily include an authority to take the interest in advance. And this is not only the settled opinion among commercial and professional men, but stands approved by the soundest principles of legal construction. Indeed, we do not know in what other sense the word discount is to be interpreted. Even in England, where no statute authorises bankers to make discounts, it has been solemnly adjudged, that the taking of interest in advance by bankers, upon loans in the ordinary course of business, is not usurious.” It is useless to make further quotations or remarks on this subject. It is a settled point.
*145 in the second place, the plea concludes, that the taking the interest in advance, amounts to more than 6 per cent, contrary to the Act, &e-, meaning the general usury law. Now we know that by the charter, the Bank has a right to take more than 6 per cent, per annum, to wit, one half of one per cent, for thirty days.
Upon these grounds, I think that the demurrer to the declaration was properly overruled, and that to the plea properly sustained.
Wo come now, to the exceptions taken in the course of the trial, to the opinions of the Court. The first need not he examined. It was an exception taken by the plaintiff, in whose favor the final judgment was.
The second was a motion by the defendant, setting out the whole evidence, and moving the Court to instruct the jury, that if they believed certain facts, they must find for the defendant. Thu Court refused the instruction, either on the ground that the question, whether the facts amounted io usury, belonged exclusively to the jury; or that the facts, as stated, did not amount to usury, and therefore did sot justify a verdict for the, defendant. Upon either hypothesis, I think the Court was wrong;. As to the first, many cases may be cited to prove, that the facts being agreed or found, it is for the Court to decide whether in law, they amount to usury. If this were not so, no special verdict would be sufficient, unless it found the usury expressly. But, in Gibson v. Fristoe, 1 Call, 54, it is decided, that though the corrupt agreement bo not expressed in She verdict, yet if it is apparent to tho Court that the matter is usury, it is not necessary for the jury to shew that it was corruptly made; and Tremaine v. Roberts, Cro. Jac. 508, is cited, where it is said res ipsa loquitur. In Marsh v. Martindale, 3 Bos. & Pull. 158, a special case was found, in which, after stating the facte, the jury find expressly that Marsh did not think he was acting contrary to law. In delivering the opinion of the Court, Lord A:w says, Cf We must consider what ivas the real trans *146 action between the parties. I told the jury that if a man agree to take more than 5 per cent, for the forbearance of money, the law declares that such agreement is corrupt, within the statute of Ann, whether the party thought, at t;me) that he was acting contrary to the statute, or not. And though the jury have found that Marsh did not think he was acting contrary to law, there is nothing in that finding to prevent us from examining the transaction, and declaring it to be corrupt, if it appear to us to be so in point of law, without sending the case back to a jury to find the corruption.” It is every day’s practice for the Court, upon a hypothetical statement of the facts, to tell the jury that the contract.was usurious. Thus in Pratt v. Willey, 1 Esp. Rep. 40, the Court, assuming the fact, pronounce the law. In Rich v. Topping, 1 Esp. Rep. 176, the doubt was about the fact; the law was pronounced. In Doe v. Bernard, 1 Esp. 11, Lord Kenyon said, it was clearly usury, and non-suited the plaintiff. In Boldero v. Jackson, 11 East, 612, the Court held the contract usurious upon the facts. In Davis v. Hardacre, 2 Camp. 375, where a picture was taken in part, Lord Ellenborough held this prima facie evidence of usury, and held the plaintiff to prove the value, and on failure non-suited him. In Jones v. Davidson, 3 Common Law Reports, 92, Gibbs pronounced the law upon the facts.
Suppose the facts (upon the hypothesis of the truth of which, the motion was made) had been found here by a special verdict; would not the Court have had to pronounce upon them ? And if upon such finding, they would have considered them to amount in law to usury, they ought, on the motion of the defendant, to have told the jury that if they believed those facts, it amounted to usury.
But did the facts amount to usury ? I think so clearly. Disguise it as ypu will, Stribbling’s was, in effect, an application for a loan. His object was to raise money, and that clearly disclosed to the Bank. He wanted $ 10,000, and his proposition says so expressly. “X offer my bro *147 iliers for @2,000, &¿c., which, together with the stock, is How did the to make the @10.000 I am to receive. Bank understand it ? The Cashier says, “ I am instructed by the Board to inform you, that they will discount you two notes, one for @ 10,000, the other for @2,500, &c. In payment for which discount, you will receive one hundred shares of stock of the Bank, &e„, at @10,000. The balance in money.” Now it is in clear proof, that the current market price of stock was @80; and the Bank, knowing this, knew that by letting Stribbfing have the one hundred shares and @2,000 in money’-, he could not raise the sum he wanted, because the Banks would not receive the stock in deposit at its full price. They therefore offer him a loan in money of @2,500; which, depositing the stock at @75, would exactly make the sum he wanted. Nothing can be clearer to my mind, than that the sale of the stock and the loan are indissolubly linked together, making one transaction; and the object being to raise money, and the stock passed above its market price, that it was an usurious contract, and that the Court ought so to have told the jury.
I think also, that the Court erred in refusing to grant a mew trial. It was a verdict against law and evidence.
My opinion is, that the judgment be reversed, and the cause sent back for a new trial, with directions to the Court, that if the same evidence be introduced, and the same instruction asked which was asked in the first part of the second bill of exceptions, that the Court shall give it.
Judge Green.
The defence to this action is usury, and the appellees insist that no corporation comes within the terms or spirit of the Act against usury; and especially that a banking corporation does not. To this the appellant’s counsel replies, that so far as the case depends upon the demurrers to the declaration and the 4th plea, the Act of Assembly *148 incorporating the Bank, although given in evidence ttpoa the trial of the issues, and made part of the record by an exception, not being set forth in the declaration or 4th pleaj cannot be noticed by the Court, it being a private ^ct anc| n0(- a gencral statute; and that therefore it does not appear upon the record; nor can the Court know judicially that the “ Bank of the Valley in Virginia” is a corporation. If it were admitted that the Act incorporating the Bank of the Valley in Virginia, so far as it relates to the details of its organization, its privileges, and the res* trictions imposed upon it, is a private Act, which the Court cannot take notice of ex officio; yet, there is a provision in it, which is general, and which the Court is bound to take notice of ex officio, since it affects the whole commu - nity; that provision which declares that all notes or bills negotiable at this Bank, shall be put upon the footing of foreign bills of exchange; and this suit is brought upon such a note. We therefore know judicially, that the “ Bank of the Valley in Virginia,” is a corporation; and the right to contract and to sue, subject to the general laws affecting the contracts of individuals, is incident to a corporation, unless those rights are in any way modified by the charter of incorporation.
It. is said, that the Statute of Usury does not apply to any corporation, because it is a penal statute, and cannot properly be extended, by any equitable construction, beyond its letter; and that a corporation not being a person, does not come within the literal terms of the statute. The terms of the statute are, “No person shall, upon any contract, take directly or indirectly, for loan of any money, wares or merchandize, or other commodity, above the value of six dollars, for the forbearance of $ 100 for a year, and after that rate for a greater or lesser sum, or for a longer or shorter time. And all bonds, contracts, covenants, conveyances or assurances, to be made for payment or delivery of any money or goods so to be lent, on which a higher interest is reserved or taken than is hereby allowed., *149 shall be utterly void,” The second section imposes apenally upon any person’s taking usurious interest, if it be corruptly taken, but not otherwise. If there had been nothing in the statute but the first clause of the first section, and the second section, the consequence would have been, that if any person had contracted for usurious interest, and had not received it, the borrower could have resisted the payment of the excess of interest above the legal rate, but not of the principal and legal interest, and if the lender had received the usurious interest, whether corruptly or not. The borrower could have recovered back the excess, beyond the principal and legal interest, in an action for money had and received. If it had been received corruptly, then the lender would have been moreover,liable to the penalty imposed by the second section. But, if the usurious interest was received ignorantly and innocently, (as might happen,) the party would not be liable to the penalty; as, if an agent should make an usurious contract in the name of his principal, and the latter were to receive the usurious interest, without knowing that the contract was usurious. Whether a corporation would come within the term per-' son, used in the first clause of the first section, and in the second section, it is unnecessary to decide; since the contract, if usurious, is avoided by the second clause of the first section, which extends to all contracts, no matter by whom made, upon which more than legal interest is reserved or taken.
It is argued, that if corporations come within the letter of the statute, they are not within the reason or policy of the laws against usury; since widows, orphans, foreigners and others, who have no agency in the management of their transactions, have their funds invested in corporations; the forfeiture of which by usury, practised by the directors, would inflict upon innocent persons a loss, which the policy of the law inflicts as a punishment for an offence; and that ¿his reasoning applies particularly to banking corporations, especially those in which the public have an interest
*150 The chief, if not. sole object of the institution of Banks, was, to increase the prosperity of the community, by fac.ilitating the borrowing of money at the rate of interest fixed by the charters; and to effect this, and to induce those who jlac¡ nloney f0 ienci ¡t9 through the agency of the Banks, these corporations were allowed the privilege of lending their notes instead of money, to a much larger amount than that of the money invested in the stock, besides many other privileges which individuals have not. The forfeiture, by the Statute of Usury, of the money lent, is not imposed upon the lender, as a punishment of an offence, so much as for the purpose of protecting the necessitous from oppression. This was the only real object of that provision of the law; and the loss to the lender, only the incidental effect of that policy. To allow a'Bank, therefore, to take usurious interest, would not only frustrate the policy of the law against usury, but the objects of their own institution, and tend to the utter ruin, instead of promoting the interests, of the community. If this argument were well founded, it would apply with equal propriety to the exemption of all trustees acting for others, from the operation of the law against usury. The interest of the State as a stockholder, can have no influence upon this question, especially as to this Bank. The stock reserved to the State as a bonus, may be disposed of at her pleasure, by the express provisions of the statute; and in that ease, her right to appoint a portion of the directors would cease. Corporations are, in their nature, bound as individuals are, by the general laws regulating contracts, except so far as they may be exempted from their operation by specific statutory provisions.
This exemption from the operation of the statute against usury, is accordingly claimed on behalf of the Bank of the Valley, by force of that provision of the charter, which provides, “ neither shall the said corporation take more than the rate of one half of one per cent, for thirty days, for or on account of its loans or discounts;” a provision *151 which, it was admitted on the other side, allows them im pliedly to take at that rate, which exceeds the legal interest of six per centum per annum.; and it is argued, that this permission to take more than legal interest, exempts the contracts of the Bank from the operation of the statute against usury, even if they take more interest or discount than is allowed by their charter.
This privilege to take more than legal interest, is not unlimited, but is restricted to a given rale of discount or interest. But for this, a contract reserving to the Bank more than six per cent inlerest, would bo void for usury, the statute applying to all possible contracts. The charter of the Bank does not repeal the statute against usury expressly, and the repeal of statutes by implication is not favoured. If, by any reasonable construction, both statutes can have effect, such construction is given fo them; and where they are inconsistent with each other, In some degree, the latter repeals the former, to the extent of such inconsistency, and no further. This is the rule laid down in the strongest terms, in many cases cited in 19 Vin. Abr. tit. Statutes, 520, pl, 84, 85, 86; pl. page 525, pl. 131, 132; 11 Co. Rep. 64, Foster’s Case; 10 Mod. 118; and this rule of construction has been approved by this Court in Warder v. Arrell, 2 Wash. 282. When, therefore, the Statute of Usury avoids all contracts, upon which an infs rest higher than the rate of six per cent, per annum ir reserved, and another statute allows, in a particular ease, one half of one per cent, for every thirty days, io tie re served, the latter repeals the former only in cases in which no more than one half of one per cení, for every thirty days is reserved. A reservation of interasí at a greater1 rate than this, is not sanctioned by the latter statute, and brings the case within the former. The Bank no longer act-; within its privilege, and the contract muet be tested by t,‘i& general laws.
It is contended that the. contract slated in the declare* lion is, upon its face, usurious; «ince it is c contra'** *152 loan, and not a discount of negotiable paper; and that to retain the interest or discount in advance in such a case, is usury. I do not, think this question arises upon the decíaIt is not stated, at what rate the discount or infercst was estimated; and the fair meaning of the declaration is, that so much only was retained as they had a legal right to retain.
The fourth plea presents a serious question, whether that part of the charter'of the Bank, which prohibits their taking more than at the rate of one half of one per cent. For 30 days, is a general law, which the Court are bound to take notice of, or not. If not, then as the Court cannot take notice of this privilege, the contract reserving the discounts or interest at the rate of- one half of one per cent. for 30 days, was clearly usurious upon its face.
The eases cited in the argument shew, that a statute may be general as to some of its provisions, and private as to others. This privilege to the Bank, to take more within a certain limit than the interest prescribed by the general laws, is particular and private in its nature, made for the benefit of that, particular corporation, and which does not concern the public generally, or any class of the community. If the whole of the residue of the Act was a general law, (as many parts of it are,) this particular provision would, from its nature, be private, and could not be noticed ea; officio by the Court. This seems to me to be the common law doctrine. The Statute of 3 Jac. 1, concerning Popish recusants, is, in all its provisions but one, a general law. It disables them to present to any benefice or ecclesiastical living, Sic., although they would, but for the disability imposed by the statute, be entitled to present; and the statute gave the right to present in such cases, to the Chancellor, Masters and Scholars, of the University of Oxford; and this donative clause was held to be a private law, which the Court could not notice ex officio. 10 Co. Rep. 57; The case of the Chancellor of Oxford, Hob. 227; Bull. N. P. 223.
*153 This ease falls clearly within the distinctions laid down in Holland’s Case, 4 Co. Rep. 76, 77. The clause in question is therefore private, unless any statutory provi¡alona shall have either made it a general law, or given it the samo effect, There are two statutes which may be
supposed to have that effect. The Act of March 13, 1819, providing for the rc-publiention of the laws, directs the Act incorporating this Bank, with very many others particularly specified, (mod of which are undoubtedly general laws,) to be published in the edition of the laws directed by that Act, without designating any of them as general or private Acts. If directs also, all Acts of a general nature passed at the then present and last sessions of the Assembly. and all Acts of a general nature then in force, not noticed in the report of the revisors, and the titles and dates of all private, local and temporary Acts, passed between particular periods, to be published in that edition; and pro - vides, that the laws published in that edition, “ shall be received in evidence, in the same manner as the originals.’5 Do these provisions of the Act of 1819, make those Acts published in that edition of the laws, which would otherwise have been private Acts, general or public Acts ? I think not. The only purpose of this Ad, in relation to the private Acts directed to be published, was, to authorise the printed copy to be given in evidence, without the iiceossity of producing the originals, or exemplified or -■worn copies; aud to these private Acts only, is the direc'low applicable, that they shall be received in evidence as ’ho originals. As to the general laws, no such provision vas necessary; nor, as to them, can it have any effect.
There are many Acts published in this edition of the laws, by express directions of the Act of 3819, which, although she greater part of their provisions are general, yet some of there are most emphatically private; as chap. 260, the Act ecneaminff ike trustees of all the, unincorporated ■nxm:; i::, Virginia, in which there is a special provision for c. nmv turvoy and plat of the town of Suffolk; for ad *154 justing the boundaries of the streets and lots, the original being lost by fire. The publication of a private Act with the general laws, cannot change its nature or effect. If it could, then certainly a clause in a public Act published ent¡re mus{ [)e considered as public or general also; and in that case, the clause of the statute of 3 Jac. 1, giving presentations forfeited by Popish recusants to the University of Oxford; ought to have been noticed by the Court ex officio; it being published with the residue of the statute, which was general. Even at common law, the copy of a private statute which concerns a whole country, as the Bedford Levels, printed with the general statutes, might be given in evidence, without comparing it with the record. Bull. N. P. 225. But, this gave it no new character as a general or private law, but only varied the proof necessary to establish its authenticity. And it was for the purpose of allowing the private Acts published in our last Code, to be given in evidence without producing the originals, that the Legislature directed them to be so published, instead of leaving it to the Courts to say in each case, whether the printed copies should be admitted in evidence, in lieu of the originals; and not for the purpose of converting Acts in their nature particular and private, into general and public Acts.
The other statute which may be supposed to affect this question, is that which provides that “ Private Acts of Assembly may be given in evidence, without pleading them specially.” At the common law, private Acts of Parliament must have been pleaded, or might have been given in evidence, according to the circumstances of the case, precisely as any other muniment of title. Butler’s Nisi Prius, page 222. The necessity of pleading such an Act in particular cases, proceeded, not from its character as a private Act only, but from that combined with the nature of the right claimed under it, and of the pleadings of the other party. I cannot think that this provision was intended to change entirely the nature of a pri *155 vare Act of Assembly, and make it the duty of the Court to notice it, whether given in evidence or not; and to change the laws of pleading, in favor of persons claiming under private Acts, by dispensing with the pleadings which the nature of the case requires. This provision of our statute, seems to be merely declaratory of the common law; and that scorns to have been the opinion of this Court in Legrand v. Hampden Sydney College, 5 Munf. 324. The charter of the Bank was properly given in evidence upon the trial of the issues of fact., and is properly in the record for the purpose of deciding the questions which arose upon the trial of those issues. But the matter of, and proceedings upon, one plea, cannot be called in aid of the matter of, and proceedings upon, another plea; and we must decide upon the demurrer to the 4th plea, as if there was nothing in the record, but the declaration, that plea, and the demurrer to it. That demurrer should have boon overruled.
Upon the trial of the issues, the Court, upon the motion of the d *fendant, instructed the jury that, if they believed from the evidence, that the Bank of the Valley in Virginia, on or about the 14th of February, 1821, loaned to E, Sfribbling $2,500, or thereabouts, for eighteen months, but made it a condition precedent to the granting of the said loan, that he should buy of the Bank one hundred shares of its stock, at the price of $ 10,000, giving his note negotiable, with other sufficient drawers and endorsers for that sum, the note to be renewed for eighteen months, and the said Erasmus complied with the conditions; and that the price of $ 10,000 thus demanded and agreed to be given for the one hundred shares of stock, on the terms of payment prescribed and agreed to, was palpably and obviously an over price for the said stock, having reference to the then selling price in the market; and that the defendant was influenced in agreeing to give the over price demanded, by the offer of the said loan of $5 2,500 or thereabouts; and that the purchase at such over price operated *156 as an inducement to the Bank to make the accommodation discount which it did make, and that the negotiable note in the declaration mentioned, was given in consideration of the said transaction; then, they ought to find for the de« fendant
The Court further instructed the jury, that if they should be of opinion that it was not made a condition of the loan of #2,500 or thereabouts, that the said defendant should buy the said one hundred shares of stock at such over price, or that the said loan was independent of the said purchase of stock, or that the purchase of the said stock was the principal object of the defendant, and that being accomplished, the Bank afterwards agreed to lend the said @2,500, or thereabouts; then such loan was not usury. To the first part of this instruction, the plaintiff excepted.
The defendant also moved the Court to instruct the jury, that if they believed that he had written and sent to the President of the Bank his letter of the 12th of February, 1821, on or about that day, and had submitted to the President and Directors of the Bank his written propositions of February 13th, 1821, and that the Cashier had given to those propositions the answer aforesaid, acting under the instructions of the said Board of Directors, and that this was the only answer by the plaintiffs to his propositions communicated to him; and that a contract was made between the plaintiffs and defendant, just before or on the 14th of February, 1821, in conformity with the terms of the Cashier’s letter, and that the account exhibited was regularly entered in the books of the Bank; and that of the sum of @ 12,377 OS cents, entered in the said account as cash paid to him, @ 10,000 consisted of one hundred shares of the stock of the Bank, at par; and that the contract was executed, continued and extended, as stated in the first special plea; and that the one hundred shares of stock, on the 14-t.h day of February, 1821, were worth, at the market price in cash, not more than @9,000, and that fact known to the Directors; and that the note sued on was *157 given in consideration of tho original note of $10,000; then they ought to find for tho defendant; which the Court refused to give, and the defendant excepted.
Tho defendant also moved the Court to instruct tho jury, that if the sale of the one hundred shares of stock was unconnected with tho loan of #2,500; yet, being a sale on eighteen months credit, the reservation of interest or discounts at the rate of one half of oue per cent, for thirty days, as had been agreed to be done and actually done, was usurious; which instruction the Court , also refused to give, and the defendant excepted.
The defendant also moved for a new trial, which the Court refused; and he cxeeptod to that also.
The counsel for the appellees objects to the form of the instruction, as moved by the defendant, because he alleges that it excluded from the consideration of the jury, the order entered on the minutes of the Board of Directors on the 13th of February, 1821. I do not think it had that effect. The motion was founded upon the condition, that if the jury should believe from the evidence, that tho contract was concluded in conformity with the letter of the Cashier; and in considering that question of fact, nothing in the motion to instruct prevented the jury from considering the effect of tho order of the Directors upon that question.
It is also objected, that the motion confined the enquiry as to the market value of the stock, to the 14th day of February, 1821; whereas the contract.was probably made on the 13th day of February; and this is well founded. The motion ought to have confined the enquiry as to tho value of the stock, to the time of the contract; leaving it to tho jury to ascertain that time; and if, in other respects, the instruction asked for was proper, it should have been given with that modification.
If the facts, upon the supposition of the truth of which (to he determined by the jury) as recapitulated by the defendant., wore really as supposed; then it was clear be *158 yond a doubt, that the contract for the sale of the stock and the loan of money, was one entire contract, indissolubly connected, and that the inducement to the Bank to lend the money was the advantage of a sale of the stock at greatly' more than its real value; and the inducement to Stribbling to give an exorbitant price for the stock, was the. lean of the money; and that the contract was a shift to evade the Statute of Usury.
It'is obvious; from comparing the opinions of the Court upon-thé first, and'second motion to instruct, that it was of opinion, that however manifest the intent of the parties in making this contract, and the motives which influenced them mutually to make it, might be in fact; yet that that intent, and those motives, were an inference of fact from the other facts of the transaction, and that the jury alone were competent to make it. And the real question upon the second exception is, whether the intent and motive of the parties to the contract is a question of law or of fact.
The intent, the quo animo, to be deduced from the acts of the party, is, in many cases, an inference and question of law, and not of fact; and this in criminal, as well as in civil cases. Although an inference of law, yet when it is involved in an issue of fact to be tried by a jury, the jury must of necessity judge of, and decide upon it; and in criminal cases, their decision is conclusive, and cannot be controlled, since in such a case no new trial can be awarded on the ground that the verdict has been contrary to the evidence or to the law. But, in civil cases, the error of the jury, as to the inference of law from the facts, may be corrected by awarding a new trial. If the intent of the party, to be inferred from the facts of the transaction, was a question of fact, it could only be decided by the jury; and it would not be competent to the Court to instruct them that the inference ought or ought not to be made. There is nothing better settled with us, than that the Court cannot properly influence the judgment of the jury as to any matter of fact, by giving their opinion upon it; and that to do *159 ¿o, is erroneous. Yet in criminal, as well as in civil cases, the Court is at liberty to instruct the jury as to the intent, legally to be inferred from the facts alleged, in case the jury should bo of opinion, that the facts are proved. Again; if the intent to bo inferred from the facts, was a question of fact, and not of law, then, upon a special verdict finding the facts, no judgment could be given, in cases whore the decision of the cause depended upon the intent., unless that intent was expressly found by the jury. For, it is an inflexible rule, that the Court, upon a special verdict, cannot infer other facts from those found. Yet, in criminal and civil cases, when the intent is important to the decision of the case, the Court infer it from the facts found in a special verdict, although the intent, he not found. Cases, however, may and do frequently occur, in which the question of intent depends upon the weight of conflicting circumstances, which it is proper to leave to the decision of the jury. Again; if intent was an inference of fact, and not of law, no case of usury could occur, in which it could he decided upon a demurrer to the pleadings, that a con. tract under the form of a contract of hazard or sale, was a shift to evade the Statute of Usury. If, to a plea of usury, in the case of a contract upon its face one of hazard, them he a demurrer, it has never been suggested that the demurrer admitted the truth of the allegation in the plea, that the contract, was a corrupt loan. If the demurrer was an admission of the truth of that allegation, then all such cases, without exception, must have been decided against the demurrant, upon that ground only, without looking' further. If the demurrer is not an admission of the corrupt intent alleged in the pica, and that, was an inference of fact from the facts alleged iu the plea; then, as the Court can make no inference of facts from facts found or admitted, the demurrer in all such cases should be overruled. Yet demurrers in such cases have been sustained and overruled, according to the legal inference of intent made by the Cnurk from the facta admitted by tis° pleading.
*160 In all criminal cases, it is the intent, and not the act, which constitutes the crime. Actus non faeit reum, nisi mens sit rea. This criminal intent is an inference of law, which the Court may instruct the jury, as upon any 0ther question of law, or may decide upon a special verdict not finding the intent. Thus, in The King v. -—, 2 Ld. Raym. 1494, it is laid down, that “ on the trial the Judge directs the jury thus; if you believe such and such witnesses, who have sworn to such and such facts, tho killing of the deceased appears to be with malice prepense; but, if you do not believe them, then you ought to find him guilty of manslaughter, and the jury may, if they think proper, give a genei’al verdict of murder or manslaughter; but, if they decline giving a general verdict, and will find the facts specially, the Court is then to form their judgment from tho facts found, whether the defendant be guilty or not guilty, i. e. whether the act was done with malice and deliberation or not.”
In civil cases, especially on questions of usury, the intent of the parties has been held to be a question of law, by a series of unquestioned decisions. In Reynolds v. Clayton, 2 And. 15; Mo 397, 560, 70; Button v. Dunham, Cro. Eliz. 642; 2 And. 121; Mason v. Abdy, 3 Salk. 390; Comb. 125; Carthew, 67, it was held, upon general demurrers, that contracts, which, upon their face, were contracts of hazard, and in' which there was a real hazard, were in truth contracts of loan and intended to evade the Statute of Usury, because óf the slightness of the hazard. In the case of Roberts v. Tremaine, Cro. Jac. 507, the same doctrine was held upon a sp-^al verdict finding the facts of the contract only, without any finding as to the intent of the parties. And in Chesterfield v. Jansen, Sir John Strange approves of the doctrine of these cases, and says, that if a contract of loan is put into the shape of a contract of hazard to evade the Statute, it is usury, and may be determined by the verdict of a jury, or by the Court’s exercising its judgment on *161 iho facts; as, he says, has often been dono. In the case of Gibson v. Fristoe, 1 Call, 62, and Marsh v. Martindale, the contracts purported on their faces, to he purchases, in the first, case of bonds, and in the secoud, of an annuity. The Court, in each case, held them to be contracts for the forbearance of debts, and shifts to evade the Statute of Usury; in the first case, upon a special verdict, which did not find any thing as to the intent of the parties; and in the second, upon a caso agreed, connected with a verdict of a jury, although the ease agreed did not admit any thing as to the intent of the parties, and the jury declared, in their verdict, their opinion, that “ the party did not think he was acting contrary to'law.” In Benton's Case, 5 Co. 69, a demurrer to a plea of a corrupt agreement against the Statute of Usury was sustained.
It is argued, that the question of usury depended, in this ease, upon the questions whether the transaction in respect to the stock, was a contract for a salo, or a colour for a loan; and that this was a question of fact for the jury, and upon which it was not competent to the Court to instruct the jury; and several cases are cited to prove that proposition. I do not think that the enquiry, whether the transaction in respect to the stock was a sale or a colour for a loan, is at all material to the merits of this caso. I have, however, looked into the cases cited by the counsel for the appellants, and do not think that they support the proposition for which they were cited. The noto of the reporter to the case of Davison v. Jones, 3 Com. Law Rep. 97, in which he states that the question whether the contract is in substance a loan or any other species of contract, belongs to the decision of the jury, if lie means by that, exclusively, Is contradicted by the case of Chesterfield v. Jansen, which is the only caso which he cites. In the-cases of Doe, v. Brown, 3 Com. Law Rep. 109, and Doe v, Gooch, 5 Com. Law Rep. 417, the only effect of the decisions, was, that a sale of land, with an agreement to re-purchase at a higher price at a future time, was not i.tsurious on that account *162 merely. There being other circumstances which led to a suspicion in both of these cases, that these transactions were a cover for a loan, it was left to the jury, who found in one case that it was a sale, and in the other, a Joan. If, in these caseSj there had been a positive agreement to re-pay the money at all events, and a collateral security for the payment, they would have been clearly disguised loans, and so the Court would have said as a matter of law. King v. Drury, 2 Lev. 7; Benton’s Case, 5 Co. Rep. 69.
The question in this case, whether the transaction in respect to the stock was a sale or a loan, was of no consequence, and was not raised. The ground of the defendant’s motion for the instruction, was, that it was a sale at an advance'of twenty-five per cent, connected with a loan of money; and if so, (as was the fact, if the jury believed that the contract was according to the terms of the Cashier’s letter,) it was clearly usurious. For in that case, the contract being entire, both for the sale and the Joan, all on the one side was the consideration of all on the other, the loan the inducement to Stribbiing to buy, and the sale the inducement to the Bank to lend. I think, therefore, that the refusal to give the instruction asked for, was erroneous.
I think, also, that the Court erred in refusing a new trial. The evidence is complete, and leaves no scruple on my mind in saying, that the loan and sale were indissolubly-connected, and formed one entire contract. The original proposition of Stribbiing, was to purchase stock, and to borrow money; and he makes the loan an indispensable condition of the purchase; and in that he discloses plainly and unreservedly that his object was to raise $ 10,000; $8,000 by pledging the stock, and $2,000 by a loan. To effect this, and to have the use of the $ 10,000 for eighteen months, paying interest, he at once offers a premium in the price of the stock, of 25 per cent. This proposition, the Bank accepted in substance. The modifications which they proposed, and Stribbiing agreed to, do not vary sub *163 stantially from his terms, and the motives for proposing them are obvious. Instead of four several notes, proposed by Stribbiing as a security for the sale and loan, drawn and endorsed by him, and his different friends named by him, (which was intended, as he said, to avoid the violating a rule of the Bank, not to allow any one person to stand on their books as payee, for more than $ 5,000,) the effect of which would have been, to bind his friends severally for portions of the debt only, the Bank, for the sake of having all of his friends bound for the whole, proposed to discount two notes of the same persons for $ 12,500; thus violating, io a great extent, one of their own rules. Instead of lending $ 2,000, and discounting $ 8,000, on thejane hundred shares of stock, as he proposed, thMwniink to discount on the stock to its full val^^lp&Híi the sá4te^ime intending to enable him to raise th| % 10,000jXvyy^h|was the condition on which alone he ^gAwllfegAmpmiJfease the stock at such a sacrifice,) offered him a loan of &2,|00: $500 more than he asked for. 'ítns^^*'ro'mífke‘mf'the $> 10,000, and an inducement to hirii*fitBa3^feiit@4§acrificc in the purchase of the stock; and he accordingly, the very next day, got at another Bank a discount of $>7,500, on the pledge of the stock. This loan of $ 2,500, was made for eighteen months, directly against the prohibition of one of the clauses of their charter, which interdicts their making any loan for more than one hundred and twenty days. It is impossible that any motive eould have induced them so flagrantly to violate the rules and charter of the Bank, but the advantage of selling, by that means, the one hundred share® of stock, at twenty-five per cent, above its real value. The letter of the Cashier, and the order of the directors on their minutes, state, in substance, the same terms; and if the order had been delivered to Stribbiing, instead of the letter, as the answer to his proposition, he must have understood it, as he could not help understanding the letter, that he could not have the loan of the money, unless he bought the stock. Considered as an answer *164 to his proposition, it could not bear any other construction; or, if the order was made, as it imports, after the contract was concluded, then it was no evidence of the contract, and Cashier’s letter remains as the only evidence of the true contract of the parties. So that, if they really diffeied in their terms, the contract could not be varied by the order.
The obligation imposed upon the Bank by the charter, to sell out any stock of their own corporation, which they might have purchased, whenever they could get par,' can certainly have no influence on any question in this cause. They were at liberty to sell under par, and they were bound to sell if any one had offered par simply; and they might have sold at any time, on a credit of eighteen months, with interest from the time of the sale, if the transaction was wholly unconnected with a loan. But, the charter neither imposed upon them the obligation to avail themselves of the necessities of another, and by the temptation of a loan of money connected with the sale of stock, induce him to give a price which he would not otherwise have given, and thus to practise usury; nor does it in any way sanction such a transaction. The Bank could not have been prosecuted for a violation of their charter, if they had refused to sell to Stribbling upon the terms they did. Their answer would have been conclusive. “ We could not sell the stock at par, without giving a loan of $2,500 in the bargain, and that for eighteen months, which would have been a violation of the charter, and subjected the directors themselves individually, to the payment of the whole amount at the expiration of one hundred and twenty days.” Nor has the provision of the charter, obliging the borrower, upon a loan on a credit of more than one hundred and twenty days, to pay at the expiration of that time, any effect on any question in the cause. This only applies to a valid contract, which bound him when made; and was not intended to subject him to the payment of a debt, which was never due, upon a contract void in its inception.
*165 There are two other points insisted on by the counsel of the appellant; one, that, as the 4th plea alleges that there was a corrupt agreement, that the Rank should discount two notes for the defendant to the amount of $ 12.O00, which were to be renewed and continued for eighteen months, and the discount to be paid in advance every sixty days, at the rate of one half of one percent, for every thirty days, and that the de.fendant was to take in satisfaction of $ 10,000 of the loan, one hundred shares of Bank stock, the contract is usurious on its face, unless it had been shewn that the stock was worth $ 10,000; upon the ground that the only motive on (he part of the Bank for paying a large part of the discount in stock, was to get a higher price for it than it was worth; and the case of Davis v. Hardacre, is cited to support the proposition. I do not think that the proposition can be maintained as a general one. It seems to have been adopted in that ease as a rule of evidence, and not as a rule of law; not upon the ground simply, that a sale of property was connected with a loan of money, but that the sale was forced upon the borrower as a condition of the loan. It, does not follow from the mere fact of a sale and loan being connected, that it was not even the choice of the purchaser to buy as well as to borrow, and that the purchase was at a fair price.
The other objection is, that the transaction being a loan for eighteen months, and not a discount, it was usury to take the discount for each sixty days in advance. I do not think that this objection is well founded. This privilege to take interest in advance, is confined to commercial paper, .nd is an indulgence to the customs of merchants. Whatever objections there may be to this, it is too well settled to be cow questioned. A discount of a bill of exchange, known to be for the accommodation of the drawer, is virtually a loan, and not the ^«re/i«se of the bill; yet, to retain the legal interest in that case, is not usury, on account of the form of the security; and if the original transaction if! not objectionable, the repetition cf it, no matter how *166 often, by previous agreement, is not. The transaction in this case, was a contract of loan upon the security of commercial paper, and this was an integral part of the contract. The same objection applies to the transaction, as it appearecj Up0n tr¡a] 0f the issues. The only effect of the provision in the charter, allowing the Bank to take at the rale of one half of one per cent. for thirty days, was, to vary the rate of discount and interest, leaving them to take discount and interest at that rate only, in the manner others might take discount and interest, at the rate of 6 per cent„ per annum. Upon loans in the shape of discounts of negotiable paper, they could only take the interest in advance, in cases in which others might take it; and if others could not take it in advance, for 120 days or more, neither could the Bank. If the notes had been payable at the expiration of eighteen months, and the discount for the whole time had been retained, I should think clearly that it was usury.
There seems to me to be an objection to the declaration not noticed by the counsel for the appellant. It does not state that the last endorser, George W. Kigar, by his endorsement, ordered the money to be paid to the plaintiffs, or assigned, transferred or endorsed the note to them. The fact that the legal title was transferred to them, is left to be inferred from the recital, that Kigar endorsed it with his own name and hand, with intent to procure the discounting of it at the Bank, and by a note at the foot of the negotiable note, signed by him, ordered the drawer to be credited with the amount, and that the note was offered to the President and Directors of the Bank, and the full amount, deducting discount, paid to the drawer, without saying by the Bank. Upon a general demurrer to the declaration, I do not think there is any sufficient averment, that the legal title to the note was transferred to the plaintiff.
*167 Judge Coalter.
The first important question to be considered in this case, arises on the pleadings, and mainly on the last plea of the , , . - . statute against usury.
On the first of those pleas, an issue was joined to the country. The second was demurred to; but, on the Court intimating an opinion that it was defective, the defendant obtained leave to amend, and then offered his plea so amended, which was a virtual withdrawal of the second plea; so that no judgment was entered on the demurrer; but, the plea so amended, was received and ordered to he filed as a ■sufficient plea, and issue was also joined thereon to the country. The last plea, and the demurrer thereto, present the questions which have been stated by the Judges who have preceded me.
On the part of the Bank it is contended, that though one half of one per cent, for thirty days is more than the rate of six per cent, per annum, yet by the Act of Assembly incorporating the. Bank, they are permitred to take interest at that rate on their discounts and loans, and had also a right to take it in advance on the discount for every sixty days; and that if this be not so, yet the statute against usury does not apply to a corporation; and if it does to a private corporation generally, it does not apply to the Bank, as well from general reasons arising out of the Act of incorporation, as because that Act authorised them to take more than the rate prescribed by the statute agr.inst usury, without any provision making the contracts void, should they even exceed the rate thus allowed.
These positions are all controverted on the other side; and first, on this ground; that the Act of incorporation is a private Act, of which the Court cannot take judicial notice, so as to bring either of those questions within their cognizance.
Whether this is a private or public Act, is then the first question for consideration. My opinion is,, that it. is p *168 public Act. The common law doctrine on this subject, I understand to be this; that Acts of Parliament either relate to the kiugdom in general, and are called general Acts, or to the concerns of private persons, and are thence ca]ie(j private. A general Act is taken notice of by the Judges and jury, without being shewn; but a particular Act is not noticed without being shewn, because it is said, that the Court cannot judge of particular laws which do not concern the whole kingdom, unless they be exhibited; for, they are obliged by their oaths to judge of all matters coming before them, according to the laws and constitution of England; and therefore, they cannot be obliged, ex officio, to notice a particular law, because it is not a law relating to the whole kingdom; and therefore, like all other private matters, it must be brought before them to judge thereon. Bull. N. P. 222. So it is said, of general Acts of Parliament, the priuted statute book is evidence; not that the printed statutes are perfect and authentic copies of the records themselves, but every person is supposed to know the laws, and the printed statutes are allowed to be evidence, because they are hints of that which is supposed to be lodged in every man’s mind already. Bull. N. P. 225. But of private Acts, the printed statute book is not evidence, though reduced into the same volume with the general statutes, but the party ought to have a copy compared with the Parliament roll; for they are not considered as already lodged in the minds of the people. However a private diet of Parliament in print, that concerns a whole country, as the Act of the Bedford Levels, for re-building Tiverton, fee., may he given in evidence, without comparing it with the record; and these things are the rather admitted, because they gain some authority fx’om being printed by the King’s printer; and besides, from the notoriety of the subject of them, they are supposed not to be. wholly unknown. Hence, as I understand, if a statute is of so notorious a character, that a knowledge of it may he presumed to exist in the minds of *169 the people, it is to be considered, as standing on the footing of a public statute; for, it is said to be on that ground that those statutes arc to be noticed.
How far these reasons for the decisions in England ply to this country, or whether any thing exists here which would induce this Court to relax from the ancient doctrines there, will be noticed hereafter; but it may be observed, that even in England, common sense has induced those Courts to relax from the strict rules formerly held, as will be seen in the case of Samuel v. Evans, 2 Term Rep. 569.
In England, the general doctrines are these: 1. Whatever concerns the kingdom in general, is a general law; whatever concerns a particular species of men, is a particular law. 2. So the same law may be both general and particular in different parts; as 3 Jac. 1, against recusants in general, in disabling them to present; yet the clause giving their presentations to the Universities, is particular, and must be pleaded or found. 3. A law which concerns the King, or the public revenue, is a general law, because ho is the head and union of the Commonwealth. So of an Act that comprehends all trades, because it relates to traffic in general. 4. So, if the matter of a law be ever so special, yet if it relates equally to all, it is a general law. Bull. N. P. 223; 6 Bac. Abr. tit. Statute, F. 5. And if if bo of a private nature, as if it concerns a particular trade, yet if a forfeiture be thereby given to the King, it is a public statute. 6. And if a private law he recognized by a public one, it must be noticed as a public law. Samuel v. Evans, 2 Term Rep. 575.
The whole of our Banking institutions are of a similar nature; and if the law establishing the Northwestern Bank, and the Bank of the Valley, is a private law, so must be the laws ectabiiVing the Virginia and Farmers’ Banks, and vice versa. There institutions, it seems to me, must be considered as public corporations, and very different from such as are brought, ?ato existence at the instance of parti *170 cular individuals, who have, beforehand, associated for particular purposes. They were instituted by the Legis* lature, on the call of the people generally, for great public State purposes, and to put this State, in a commercial p0jnj. 0f view, on an equality, as to Bank accommodation, with the surrounding States; to increase the circulating medium beyond the metallic capital; to keep the funds of money-holders within the State, which otherwise might have gone to fill the vaults of other banking-houses, or have been converted to purposes of usury, unless retained and properly used, by an increase of the legal rate of interest. Their notes were, moreover, receivable in all payments to the Commonwealth; so that the collection of the revenue was made more easy and certain. The vaults of two of them are the secure depositories of the public treasure. They facilitated transportation of money, and kept down exchange; and although it may be, and perhaps is, questioned by some, whether all the expected advantages have not been more than outweighed by the bad effects of those institutions; yet no one can doubt that they have been called for by the people at large; and that they were considered essential to the State for the great purposes above. Hence the laws establishing them, are little short in importance, as it seems to me, of the power of coining money itself.
But these laws, on their first enactment and publication, seem to have a public and general character. They are addressed to monied capitalists, foreign and domestic, at the same time that care is taken to avoid any monopoly of the stock; so that all who chose might participate. • The State herself, too, takes a large interest in all of them, and retains over all of them an almost overwhelming power of coiftrol; with a duty and power in the Legislature, at every session, to examine into the affairs of the Bank, in the faithful exercise of which, every man in the State who possesses a Bank note is interested. The rate of discounting and lending, was a subject, too, in which all those (no small *171 portion of the community,) who might have occasion for Bank accommodation, were interested. In addition to all this, we find penalties imposed by each of those laws, re» eoverable either wholly or in part for the State, on d i re c-tors dealing contrary to the charter, &c.; and finally, we find them recognized by laws confessedly public, as well in those punishing forgeries, larcenies and frauds, in officers and servants, as the laws enforcing the payment of specie for the deposit of the public monies, and in some of our execution laws, which had a temporary existence, soon after or during the last war, &c. In short, it seems to me, that almost every criterion of a public law, as distinguished from a private one, above noted, may be applied to these institutions.
If, however, there could be any doubt on this subject in England. I think there ought to he none here. The Act which permits private laws to be given in evidence without being pleaded, was surely intended to make some change or relaxation in the ancient doctrine; and, I am not prepared to say, that the counsel was wrong in supposing that the privilege thus granted was not confined to the case of giving them in evidence to the jury; but, that they could equally he shewn to the Court on an issue of law. I, believe that this point was not fully if at all considered, in the case of Legrand v. Hampden Sydney College. The parties there agreed to receive the certificate of the Chancellor, that the Act was before him, and that he would certify it on a certiorari, if required. Here our printed statute book is as complete evidence of a private statute, I believe, as a copy compared with the Rolls; and it may be then, that this statute was intended to put public and private Acts on the same ground of authenticity and public notoriety; and if so, I see no reason why they might not equally be shewn to the Court as the jury. But, be this as it may, all these statutes are expressly directed by law, to be printed in the New Revised Code, 1 Rev. Code, 7, together with all the undoubted public. Acts of the State; *172 and as contradistinguished from these, the titles and dates of private and local Jlcts are directed to be published; and it is expressly enacted, that the laws, so directed to be pub-when examined and found correctly printed, &c, s¡lau i3e received in evidence in the same manner as the originals; lb. 14; thus giving them the station and authenticity of public laws, if they were not so before. But, those creating the Bank of Virginia and Farmers’ Bank had long before been recognized by legislative sanction as public laws.
By the Sessions Acts of 1806, chap. 14, reciting that Samuel Pleasants had prepared for publication a continuation of the Revised Code, containing a collection of all Acts of a public nature passed since 1801, a publication of them is sanctioned, to be received and considered of equal authority as the originals are, Sic. The Act establishing the Virginia Bank is to be found in the second volume of this compilation. After this, viz: in 1811, the Farmers’ Bank was established, and in the same Session, chap. 21, another publication is authorised, of a new edition of his Code by Samuel Pleasants, with a Supplement to the second volume, containing the public Acts since 1817, and the titles oí private and local diets. This Act also makes it the duty of the public printer to separate, in his publications, the public from the private Acts, with separate indexes, Sic.
In the Acts of this Session, that establishing the Farmers’ Bank is published as a public Act; and in the edition thus authorised, the Virginia Bank law is again published as a public Act in page 60; and that of the Farmers’ Bank in the Supplement; as is a law authorising both Banks to lend money to the General Government, on any terms they could agree on.
By the Act of 1813-14, chap. 31, the charter of the Virginia Bank is extended, and is published amongst thepitb* lie Acts of that Session, as is the Act giving to the Farmers’ Bank half the deposits of the public monies; and so *173 5s {he Act of 1814, authorising both Banks to issue notos as low as $ 2 and $ 3, (and which authority to issue notes, J presume must be a public law;) and so also are the Acts of 1815, chap. 22, and 1816, chap. 7, as to the resumption of specie payments by these Banks, not only of a public character, I presume, but are found amongst the public, laws. And finally, the Act of 1816, chap. 39, establishing the Bank in question, is published in the public Acts of that Session.
In addition to all this, the very plea before us, both in its beginning and conclusion, lays the alleged corrupt agreement to be against and void by the diets of Assembly; thereby recognizing two Acts on the subject, to be taken cognizance of by the Court»
Having a right, then, as I conceive, to look into the Act of incorporation, the first general question is, whether a contract with a corporation is within tho Statute of Usury. This, as a general question, is not without its difficulties; nor am I prepared fully to decide it. It seems to me, however, that a corporation is not a person ifcho cars he punished under the second section of the Act; and I am by no means prepared to say, that the agents of a corporation, with whom an usurious contract is made, can be punished under that section, as individuals. They may receive the usury altogether as agents, having no ínteres! whatever; but eyen where interested as members of the corporation, it is an interest in common with others, and may be a very small interest in them, whilst the punishment may he very heavy. But an officer may receive, who neither had an agency in the contract nor an interest in the money. Besides, if the contract is made with tho corporation, how is the officer who, as treasurer or cashier, receives the money, to be punished for receiving, unless the contract can bo pleaded to, and invalidated, as one made with ,/l. B. and C. as individuals, he being one of them ? If Jl. lends money to B. on usury, and takes his bond and assigns it to C. for value, or makes him his mere *174 agent to collect, and who is informed of the usury, but is told that B. will pay, and B. does pay him; C. cannot be punished for this usury, though it would be otherwise if A. had acted as his agent, and the loan was in reality made by C. who knew of the usury. The receipt of the usury must be by him who is the usurer, and who alone incurs the penalty inflicted by the second clause. The usurer is the party who lends the money. Thus a man gives his individual note to the Bank for a loan, and pledges his stock for the payment, on an usurious contract,; can this be said to be a contract and loan to him by A. B. and C. who were the President and Directors present? Suppose it to be decided to be a case of usury, on the grounds here contended for, to wit, that the transaction was not a discount of a note of a third person, but a loan, and that interest in advance in such a case is usury. This interest is retained in the coffers of the Bank, the cashier only paying the balance after its deduction. Who are the usurers, and who has received the usury in this case ? And how is this usury to be pleaded under the first section ? And who is to be punished for it under the second ? If the individuals who made the contract are guilty of the usury, then it must be so pleaded under the first section; and who is to be punished for it under the second ? If the individuals who made the contract are guilty of the usury, then it must be so pleaded; and if so found, then they have used, on an individual contract, the monies of the corporation, and are answerable for. it; but the corporation has received the usurious interest, and if it could be punished as a natural person, still it would not have incurred the penalty, as it was not the usurer, should it be decided to be a contract with the President and Directors individually. But, if it could not be pleaded to, and avoided, as a contract with A. B. and C., but must be pleaded to, or is pleaded to, as a contract with the corporation, then the corporation would-be the usurer and also the receiver of the money, and not A. B. and C., the individuals present at the Board of Di *175 rectors, or D. the cashier, who paid over the nett proceeds; and of course, they could not, in their natural and individual characters, be punished, as it has been argued that they could.
For these, amongst other reasons, I am of opinion, that though there may be a contract with a Bank, which would be usury if made with an individual, and a receipt of usurious interest, which would subject that individual to the penalties of the second section of the statute, there is no one, in the case of the Bank, who can be subjected to those penalties. In other words, an incorporated Bank is not a person, within the meaning of that section of the Act.
But it is contended, that though this may he the case, still a contract with a banking corporation, which would he usurious and void in case of an individual, may bo pleaded do and avoided, either as one made with the corporation, or as one made with individual members of the board; and that though pleaded to as a contract with the corporation, as is the plea in this case; and although the corporation may not be a person, within the meaning of that word as used in the first member of the first section; yet, it being a contract for usurious interest, it is within the meaning of the second member of that section, and may be avoided by such plea as is pleaded in this case.
If I understand the argument, it is this; that the Act, in the first member of the first section, provides, that no per= son shall, upon any contract, take for loan, &c. more than six per cent. lie shall not receive more than that. If he does, he shall be subjected to the penalties of the second section; and although it is conceded that a banking corporation is not a person, who can be charged as having, upon a contract for that purpose, taken for a loan a greater sum than is by law allowed, so as to be punished therefor under the second section; yet, as the first section proceeds to declare that “ all bonds, contracts, ike. to be made for payment of any money, &c. lent, on which a higher interest is reserved or taken, &e. shall be utterly *176 void,” it is competent, by plea, under this statute, to avoid such contract, though it is made with one who is not a person within the meaning of the other provisions of the law» hi other words, that though the Bank, by its officers. knowingly makes the contract, and knowingly receives the interest, and although there is no one who can be pun» ished for this corrupt contract and receipt of usury, the contract is void.
This construction seems to detach the first member of the first section from that section, and to attach it to the second section as a necessary appendage to it. But it will be found, that the second section is complete in itself, and does not require the aid of the first section to make it so. In fact, it is taken nearly verbatim from the statute of 37 Hen. S, chap. 9, which inflicted that punishment without forfeiting the debt. The first member of the first section must, therefore, be taken as properly belonging to that section, and indeed is coupled with the second member by the word and. That section, therefore, seems to me to mean the same thing, as if it had said, “no person shall contract to take directly or indirectly for loan, &c. above the value of 6 per cent. &se.; and all bonds, contracts, 8tc. for payment of any money, &c. so lent, on which a higher interest is received or taken, &c. shall be void, &c.” But the words “so lent,” it is said, merely mean at a higher rate of interest; but those expressions themselves immediately follow those words, and therefore, I think it most fair to refer them back also to the contract and the person with whom it was made. Suppose the words had been, “ no natural person shall, upon any contract, take, &c.;” this would stand better with the second section, if I am right in supposing that a body politic cannot be punished. But could it then be contended that the second member, “and all bonds, contracts, &c. for payment of any money, &e. so lent,” extended to contracts made with an artificial person or body politic ? It would seem to me, (to say nothing of the penal nature of the statute,) that such construe* *177 don could not be maintained. On tho whole, it seems to ma at present, lhat the person who lends, and whose eon-tract is to be avoided by a plea of the statute, must be a person within the meaning of that word as used in both tioas, and that if tho same word means a natural person in the second, it moans such person in the first also. It is very usual in legislation, when it is so intended, to say every person or persons, bodies politic or corporate. But, this is not do no where pecuniary penalties aro inflicted, as corporations cannot be so punished. Their legitimate punishment for violating the law of their existence, seems to be a destruction of that existence itself by the power who created them. As the pica in this ease does not allege the contract to have been rondo with a natural person, it is not necessary to speculate further on what would be the result had it done ho. It admits that, the contract was made with the artifical person, and that that person took the alleged usurious interest. It seeks to present a case, not only of a contract to take, bat an actual taking of unlawful interest by such person.
Bui, in addition to ibis general view of the subject, It may turn out, on a sound and reasonable construction of the law, that it was not. intended by the Legislature to subject the Baúlis to the Siteu-to of Usury. These corporations wore instituted by tho Legislature, at Ilia instance of the whole comiJi’unity, for great public and State purposes as aforesaid. The deep pecuniary interest taken in them, by the State, as well as the watchful guardianship and powerful control rotainad by her over them, has united her interest and directiou oí them, with that of the monied capitalists who became joint stockholders with her. The estates and "meome of widows and orphans, in short the solvency of the Banks to their various creditors and cestui que trusts, public and private, depends on the faithful management of j lioso institutions, mid that so little of the capital as possible chould bo put to hazard, or subjected to loss. The room object vato create a monied capital, to *178 be used principally in loans and discounts, and in facilitating exchange by the purchase of bills, &c., and that those entitled to accommodation might have the use of that capital at reasonable interest, for the advancement of trade, agriculture, manufactures, &c. The management, of course, was to fall into the hands of persons of high trust and confidence, who, though they might have some interest in the fund itself, would have more interest in the legal and regular exercise of the trust, and in the preservation of the fund, than in putting it and the existence of the institution itself, to hazard, by usurious contracts, for the small'gain which would fall to their share, on that score; more interested in holding their offices, than in forfeiting them, for the gain arising from such mismanagement. The inducements to avoid all contracts contrary to the charter, would be predominant with them. The remedy, in case of misconduct, was prompt and easy, whilst the fund would be secured against the consequences of their ignorance or wilful misdeeds, by exempting it from heavy forfeitures its consequence of such ignorance. Justice to the public, as well as to the innocent stockholders, seems to require that the fund should not be forfeited, through the ignorance or misconduct of agents thus acting under a special and limited power; whilst oppression by usury, to any great extent, could not be apprehended. On the other hand, if it could be supposed that these agents, many of whom act without reward, were to be subject to great individual loss, arising from their ignorance or mistakes, few would be found willing to risk such consequences. When they are made personally responsible or punishable, the misconduct for which such liability is incurred, is distinctly stated in the law. If, then, any loss to the institution had been supposed possible, under the statute against usury, it is reasonable to suppose that a provision would also haye been made in that case, to throw the loss on those who should occasion it, unless, indeed, the difficulty of getting agents who would encounter such hazard, prevented it. But, if *179 a loss by culpable misconduct in this respect, had been supposed possible, it would have been as reasonable to visit that on those guilty, as in the other cases provided for by the Act. But, no inducements existed for such misconduct, and if, from inadvertence or ignorance, (as in receiving in» terest in advance,) usury should take place, it would not he such a ease as to require the severe inflictions of the statute; inasmuch as, if usury never had gone further than that, the statute probably never would have been made. In fact, to borrow money from such an institution, acting by agents under a limited power, and then to seek, on such grounds, to forfeit the whole money received, to the ruin of the innocent and helpless stockholders, seems to me, in a moral point of view, not to be better than griping usury itself, and ought not to have been sanctioned by law. Nor can I perceive that it would have been sound policy io have declared by law, that, a borrower from such a fund, by conniva,nee with such an agent, and inducing him in any way whatever, knowingly and culpably to violate the trust reposed in him, might thereby take to himself the funds of the innocent. Justice to them would have required protection against such fraud and combination, instead of punishing the innocent,- and letting the guilty go free. Had the question, then, been presented to the Legislature, it is reasonable to suppose that they would not have subjected the Banks to the laws against usury.
But, the subject seems so far at least to have been before them, as to allow the Banks to take a rate of interest, which, in cases of individuals, would be usury. This part of the Act seems to me to have considerable bearing on this question, not only in support of the general view 1 have taken, but as it regards the pleadings in such a case. Had the Act declared, that on their discounts and loans, the Banks should not take more than legal interest, this reference to the statute, against usury would have afforded a more plausible ground to say, that it was intended to subject them to that statute. But, the terms are, that they shall not take *180 more than one half of one per cent, for thirty days, t hereby exempting them from the effects of that statute, at least so far as this exceeds the legal rate. Having thus far raised, this case, the legal rate of interest, without superseding sanctjons of the statute against usury, in case of exceed» ing this rate, (as has been uniformly done, both here and in England, when the rate has been changed,) affords, to me, a very cogent reason for believing that it was not intended that those sanctions should be applied; especially, as it seems to me, that justice, public morality, and sound policy, required that they should not be applied.
But, let us test this question by the course of pleading. Which would seem to me to be necessary to support a de» fence, going to a total bar of the action under this statute»
The plea under consideration, shews the difficulty coun» sel had in presenting such a defence. It seems to he neither under the one statute, nor the other; hut to rely ors both; and on that account would, perhaps, be bad on a special demurrer. Suppose it had been simply and singly a plea under the Statute of Usury, that more than 6 percent* had been contracted for and taken; it is said that this would have thrown it on the plaintiff to reply the Act, and shew, that by it, the Bank had a right to take more. Perhaps this would have been right, if this is to be considered a private Act; but, considering it a public law, I incline to think that the plea would have been bad on demurrer, or in arrest of judgment. But, suppose the plaintiff had replied the Act; then it is said that the defendant could rejoin and say, “ the Bank contracted for and had taken more than the rate so allowed.” But, would not this involve a difficulty something like a departure in pleading? Under which statute would he claim the forfeiture of the debt? Suppose that- after raising the interest to 6 per cent, there had been a plea of the statute allowing but 5 per cent.-, and the plaintiff had replied the new statute, and that the contract arose under it; to which the defendant rejoined a contract for more than 6 per cent.-, he would then be obliged *181 „o conclude, and avoid the contract under the last statute. But, that statute would have a clause avoiding it, which this has not. But., if the plea had on its face» shewn, that the contract was after the statute allowing G per cant, the ■ plea would have been bad on demurrer. Here, the plea admits the contract to be with the Bank, and, of course, under a law allowing a greater interest to be taken than 6 per cent.', and yet it claims to avoid the contract under the law which avoids contracts where more than six per cent, is taken. Suppose then that the plea had gone on the latter law, and had stated that by the Act of incorporation, the Bank was not allowed to take more than one half of one per cent, for thirty days, cm its loans and discounts, and that there was an agreement to discount the note in question, and to take Ihereon more than one half of one per cent, for thirty days, and which was actually taken, could such plea have regularly concluded, that by virtue of chat Aei, (to wit, the Act which vacates contracts when more than six per cent. was contracted for or taken) the note so discounted was void ? I doubt exceedingly, whether the. plea could have claimed to avoid the contract under the usury law. There has been no law that I can find, either here or in England, in which the rate of interest has been generally or partially changed, in which it was not deemed necessary to re-enact the penalties or forfeitures for the usury, if they were intended to be applied in such case, In this State, the rate of interest was at one time high, then reduced until it got down to five per cent, and was again raised to six per cent.', and in every case, this was the course of legislation. A departure from such an uniform course, especially in the case of a statute so highly penal, is, with the other considerations above noticed, euough to satisfy mo that the Legislature did not intend to apply -the penalties and forfeiture inflicted by the Statute of Usury, to the Banks.
Suppose a law should pass, raising the rate of interest in a certain species of contracts to seven per cunt,, inflicting *182 a personal punishment on the lender for taking more, and omitting to avoid the contract or punish the party under the usury law, if more was taken; would he be subject to that law ? It seems to me he would not. We would hardly ^,e af. ]i|jerty to say it was an omission and oversight of the Legislature, and infer an intention still to subject him to that law. In the case before us, though the rate is raised, and that, in regard to a corporation, who could not even be punished under the second section, but who may be punished under the Act of incorporation, by destroying its very existence.
This view of the case, if entertained by a majority of the Court, would put an end to this cause. As I stand alone, however, on this point, it becomes necessary to take a brief view of the other questions arising in the case.
The plea, then, presents this question arising under the Statute of Usury; whether, an application to lend money, and to discount the note of the borrower, endorsed by certain endorsers, and to continue it for eighteen months, taking a discount in advance of one half of one per cent. for thirty days, (which, though more than six per cent., is admitted not to be usury, if no more than one half one per cent, for thirty days had been taken) is usury, because taking it in advance makes it more ? In other words, is a discount of a note on a deduction at the rate of legal interest on the whole sum secured by the note, usury ? It seems to be admitted, that in regard to commercial paper, (within which class the note in question falls,) the long usage and custom of trade has sanctioned this course, provided the paper has but a short time to run, as sixty, ninety, or perhaps one hundred and twenty days; and the Courts seem to have sanctioned this custom. This course of decision, I understand it to be admitted, ought not now to be disturbed.
But, it is said, that this custom and course of decision only apply to notes of third persons offered for discount, and not to a note given to secure a loan previously agreed *183 on, however short the time it has to run; and a fortiori, . « . j not to a loan which, it is agreed, is to run ior a long time as eighteen months.
Had the note been taken, payable at the end of eighteen months, whether given by the borrower himself or by a third person, and offered for discount, it would not have been within the mercantile usage. But, though the agreement stated in the plea was to continue the discount or accommodation for eighteen months, yet it was also agreed that the notes should be renewed every sixty days; which put it in the power of the party to pay at any time, and thus stop the interest. So that, it seems to me, the case is reduced to one of a loan for sixty days.
The paper is then one of a mercantile character; and as to the time of payment, is within the usage. But it was on a loan to the maker. The doctrine urged on this point is a very serious one; and if sustained, will affect a great majority of the transactions at our Banks; probably every ease in which the maker is directed to be credited with the proceeds, as it is the maker, in such case, who offers the note for discount.
But the difference, if any, between a note discounted at the instance of the maker, and at that of the payee, or of a third person, who is the holder, seems to me to be so slight in the real substance of the transaction, that I would be very unwilling to sanction the doctrine contended for. It may be, that in reality the endorser is indebted to the maker, though ostensibly it is otherwise. The mercantile character of the paper precludes any enquiry or necessity of enquiry, into its real consideration as between the parties to it; and in fact, in all cases of discounts, the object Is to raise money presently for money to be paid hereafter. Them might be more doubt, perhaps, in the case of a note given by the borrower directly to the Bank, secured by a pledge of stock, should interest be taken in advance» But, concerning this, I mean to intimate no opinion. On the whole, I think the demurrer to this plea was properly sustained.
*184 The remaining questions in the cause are presented bj the bills of exceptions. I think both of the instructions mentioned in the first bill of exceptions were correct. Bui although these instructions were given at the instance, and on the motion, of the defendant, and that part thereof operating in his favour, was excepted to by the plaintiff; yet it seems, the defendant either did not think the instruction so given went far enough; or, doubting whether the jury would draw from the evidence the conclusions which that instruction permitted them to draw, and which the Court; seemed to think it was necessary for them fa draw, in order to find for the defendant, he moves for another instruction; the whole evidence is spread on the record; and the Court is asked to instruct the jury, that if they believe ihafc the defendant wrote a certain letter to the President of the Bank, and that the cashier, acting under the instructions of the Board of Directors, returned a certain written answer, and that that was the only answer ever communicated to him, (although it be admitted that a certain resolution of the Board was entered into, but not communicated;) and that a contract or agreement was made by the Bank with the defendant, in conformity with the terms of the letter from the cashier; and that the discounts and renewals, &c. took place; and that the @10,000 on the discount charged in the account to the defendant, consisted of one hundred Bank shares estimated at par, when, on the 14th day of February, 1821, they were worth, at the cash selling price, not more than @9,000, which was known to the Board of Directors; and that the note sued on was in consideration of the contract; then the jury ought to find for the defendant.
Now, if the object of all the evidence introduced by the defendant, was, to prove the ease as stated in the first instruction mentioned in the first bill of exceptions, and if it was necessary, as I think it was, in order to entitle the defendant to a verdict on the evidence, that he should make out his case as stated in that instruction; then it *185 seems to me, that the jury were, at least in the first instance, the proper tribunal to try the fact, and draw the inferences necessary to make out the defence. The jury were there instructed, that if they believed from the deuce that the Bank, on or about the 14th day of February, 1821, loaned to Erasmus Stribbling $2,500 or thereabouts for eighteen months, but made it a condition precedent to the granting of the said loan, that he should buy one hundred shares of the Bank stock at 010,000, giving his note therefor, and that he complied therewith; and that the price of one hundred shares of stock, on the terms of payment prescribed and agreed to, was palpably and obviously ati over price for the said stock, having reference to the then selling price in market, and that the defendant was influenced in agreeing to give the over price demanded, by the offer of the said loan of 0 2,500; and that the purchase at such over price, operated as an inducement to the Bank to make the accommodation discount which it did make, and that the note sued on was given in consideration of this transaction; then, they.ought to find for the defendant. But, if it was not madeyt condition of the loan of 02,500, that the defendant should purchase the stock at that price; or, that the said loan was independent of the said purchase; or, that the purchase of the said stock was the principal object of the defendant, and that being accomplished, the Bank afterwards agreed to lend the 02,500; then, such loan was not usu.y.
Now, so far as I can understand the case, it was necessary for the jury to come to all these conclusions on the one sirio, and against those on the other, in order to justify a verdict for the defendant. His counsel, however, instead of excepting to the opinion and instruction given, moved for a now instruction, lens precise and clear, and consequently more calculated to embarrass the jury, than the instruction given; and in which, some things are withdrawn from the jury, which, it seems to me, if: was therr f-xclnaivc province, at least in the first instance, to decide. *186 Thus, the instruction moved for refers it. to the jury only to say, whether certain letters were written, and whether a contract was made between the parties, in conformity with the terms in the cashier’s letter, and consequently ieaVes it to the Court exclusively to decide, what was the intention of the parties in that contract; whether a loan, on condition to take stock at a given price, was intended, or a sale independent of a loan, as was contended on the other side.
As to the value of the stock too, nothing was left to the jury, but to say, that the cash price was not more than $9,000; throwing it on the Court to decide whether, considering the offer to purchase at par, and the other circumstances of the case; the terms of payment agreed on, and the conflicting evidence as to the price on a credit. Sic., together with the possible influence of the offer to lend the $2,500, &c.; it was a sale, or in substance an usurious loan of the whole money. If. seems to me that it was an attempt to evade or forestall the province of the jury to weigh the circumstances, and decide on these matters, contrary to the great principles of the jury trial, and to the authorities on this subject, so far as I have been able to examine them; and the more especially, as the whole merits of the case seem fairly and fully to have been submitted to the jury, on the first instructions given.
But, the assumption in the instruction moved for, that the resolution of the Board of Directors, though before the Court and jury, was not to weigh with either, in deciding what was the contract, (as it undertakes to confine the enquiry on that subject to the letter of the Cashier alone) is another reason with me, to justify the rejection of that instruction.
The next instruction asked for, simply relates fo the question, whether, taking the interest in advance in this ease, was usury; and which, for the reasons before given, I think was properly rejected.
As to the motion for a new trial, I feel more doubts; for, although I deem it wrong to withdraw from the jury the *187 decision of the facts of the ease, and think it their province to draw all the inferences and conclusions arising from partieular circumstances; yet I am equally clear, that what they may do is always subordinate to the control of the Court, by granting a new trial in a proper case. The case, however, was tried before a Court and jury who heard the evidence, and who concur in opinion that no usury was practised. The negocialiou was opened by an oiler to purchase the stock; and although that was accompanied by an application for a loan on it, which was rejected, that circumstance, though it shewed that the purchaser was in want of money, I presume did not disqualify tho parties from selling and purchasing. It was not unknown to either of them, and at any rate, not to the defendant, that, he could at once raise money at, a neighbouring Bank, on the stock, nearly to the amount he asked of the Galley Bank. A purchase of stock, therefore, would give him a great portion of the relief he wanted. The power to make such an use of stock, will always enhance its value in a contractor time; but surely that does not disqualify a holder from selling on time. Had an offer been made to a private stockholder to purchase on the same terms, he might have refused, though the cash price was but, $80; for, he might have argued thus: “Myr slock will give me si % per cent. on the par value, which is all that is offered; and at or before the end of eighteen months, it. may be above par, and In the mean time, I cannot use it.” But, there was an offer to lend $2,500 on the security of, a note endorsed; and this, on the one hand, induced the defendant to purchase the stock at. the price, whilst the offer of that price induced tho Bank to agree to that loan. If this was so, then the Judge instructs the jury that it was usury; and they, from the circumstances, were to say whether the fact was so or not. They say it was not so. They, who lived near the Bank, and heard the evidence, saw no reason to believe that, the Bank would not have extended that accommodation to tho defendant, on the security offered. *188 whether he purchased the stock or not; and it would be strange if they would, provided they were looking out for secure customers, as was probably the case. The jury also may have thought, that the purchase of stock on time was t]le great and primary object; as it gave to the party'the chance of probable rise in the price, as well as the certain means of raising a large sum of money; and that he would have effected this object at all events. It seems to me, that they were the proper, if not the exclusive, tribunal, to weigh the circumstances, and decide this matter; and as that decision was confirmed by the Judge before whom it was made, I cannot say that it was wrong.
On every ground, therefore, I am for affirming the judgment.
Judge Cabell.
In arguing the demurrers filed in this cause, a preliminary question was made by the counsel for the appellant, whether the Act of Assembly establishing the Bank of the Valley be a public or private Act. Without adverting to other considerations, there is one which satisfies me that we must regard that Act as public, and not as private. By the 7th section, (see 2 Rev. Code, 97,) it is directed, that in addition to the capital stock of the Bank, to be raised by subscription, there shall be created in the name of the Commonwealth, for" the benefit of the Fund for Internal Improvement, a number of shares equal to IS per cent, on the amount of stock subscribed. The Commonwealth is thus made a member of the corporation, by the law giving it existence, and prescribing its privileges; and as the corporation thereby becomes a matter of public concern, in which every man in the community is directly interested, that law must be a public law.
The counsel for the appellant, endeavoured also to make a distinction between the Bank’s discounting a note, where the transaction is in fact a loan, and the note taken as a *189 mere security; and the discounting a note previously given for valuable consideration; and contended, that in the former case, it would be usurious if the Bank exacted in advanee, interest on the full amount of the note. It is true, that in ordinary loans, it would be usurious to stipulate for the payment of interest in advance, on the whole amount of the loan. But, many privileges are allowed to commercial paper. One of these privileges is, that in discounting such paper, full interest may be required in advance, even where the transaction is a loan, provided it be done in the usual course of a business. The English books are full of decisions on this point. The Act of Assembly puts notes negotiable at this Bank, on the footing of foreign bills of exchange, the most favoured class of commercial paper. There is, therefore, no ground for the distinction contended for.
In considering the exceptions to the opinion of the Court on the motion to instruct the jury, and on the motion for a new trial, the questions arise, 1. Whether the Aet entitled “ An Act to reduce into one Aet the several Acts against, usury,” (1 Rev. Code, 373,) be applicable to corporations generally ? 2. Whether that Aet applies to this particular corporation ? 3. Is the transaction, as detailed in the bill of exceptions, usurious ?
1. Does the Act against usury apply to corporations generally ? That Act was made for the benefit of the whole community, to protect the necessitous against the advantage which others might be disposed to take of their imprudence. Its terms are very general. “ No person shall, upon any contract, take, &e. above the value of six dollars, &c. and all bonds, contracts, &c. on which a higher interest is reserved, &e. shall be utterly void,” The mischiefs to the community, from the practice of usury, would not be less when carried on by a monied corporation, than when carried on by individuals in their natural character. Corporations are as sensibly alive to their own interest, as individuals; nor am I aware that legal sanctions are less necessary *190 to restrain artificial, than natural, persons, from the commission of wrong. The term “ person,” used in the law, is unquestionably sufficiently comprehensive to embrace corporations; and it must be held to embrace them, unless there jje something in the law shewing the Legislative intention to restrict its application. It is said, that such intention is manifested by the second section of the law, which prescribes as a punishment on the “ person” taking usurious interest, the forfeiture of double the value of the money or thing lent, &c.; that there is no instance in which corporations have been subjected to pecuniary penalties; and that, therefore, it is fair to be presumed, that corporations were not intended to be embraced by the word person in this section of the law; from which an inference is attempted to be-deduced, that the term <e person” was intended to have a restricted application in the first sentence also. It may be that there is no other case, in which corporations have been subjected to pecuniary penalties; as to which, however, I have not enquired, and therefore give no opinion. Let it be so. It would by no means satisfy me, that it was not the intention of the Legislature to subject them to the penalty in the case of usury. If a practice be highly injurious to the community, which it is deemed expedient to restrain by pecuniary penalties, and if corporations may be supposed to be exposed to the temptation of engaging in that practice, as well as natural persons, why should not corporations be equally subjected to the pecuniary penalty ? It would certainly be competent to the Legislature to subject a corporation to such a punishment; and it would seem to be an appropriate punishment. Personal punishment cannot be inflicted on a corporation, and a forfeiture of the charter might not be deemed expedient for every offence. Itissaid, that punishment might be inflicted on the agents of the corporation. That is very true; and such punishment might be very proper as an additional sanction. But, it by no means follows, that the corporation itself should be not only exempted from punishment. *191 but should be allowed the benefit of the wrong committed by its agents.
But, I see no necessary connection between the first and second sections of the law. If, therefore, it were true, that corporations could not be punished under the second section, it would not follow that their contracts are not to be vacated under the first section. The great object was to protect the fleeced borrower, and that object requires that the. provision, as to vacating the contract, should apply to artificial, as well as to natural, persons; and such, I think, was the intention of the Legislature.
2. Does the Act against usury apply to this corporation ?
The- argument, on this point, presupposes that the law applies to corporations generally. If there be an exemption in favor of this corporation, those who contend for it must prove it. The exemption is attempted to be deduced from the last clause of the 10th fundamental article of the constitution of the Bank, (p. 101.) “ Neither shall the said corporation take more than at the rate of one half of one per cent, for thirty days, for or on account of its loans or discounts.” But, if the general usury law would apply to this corporation but for this clause, I cannot perceive how this clause exempts it from such application. A subsequent law is hold to repeal a former one, only by express terms or by necessary implication. It is not pretended that the former law is repealed, in this case, by express terms. Is it repealed by necessary implication ? The necessary implication, by which a subsequent law repeals a former law, is where the two laws are so inconsistent, that they cannot -stand together. But, there is no inconsistency here, except that the rate of interest is changed as to this corporation, from six per centum per annum,, to six per centum for three hundred and sixty days. In all other respects, the two laws are consistent and in harmony. In all other respects', this corporation, therefore, is subject, as before, to the general law concerning usurv. •
*192 3. Is the transaction, as detailed in the evidence stated in the bill of exceptions, usurious ?
It is impossible not to see that Stribbling was in great want of money; and that, in his negociation with the Bank, money Was his only object. It is true that he was willing to receive Bank stock in part, but it was to be received, and so he informed the Bank, only as the means of getting money. It is impossible not to see that the Bank availed itself of his distress for money, to pass off to him, one hundred shares of their stock, at a price nearly twenty-five per cent, above its real value, in order to enable him to raise a part of the sum he wanted. This pretended sale of stock was, directly and inseparably connected with an actual loan of the residue of the money that he required. A case of more palpable usury, was never attempted to be covered by a shift or device.
In the case of Pratt v. Willey, 1 Esp. Rep. 41, in an action by the endorsee of a promissory note against the defendant as maker, the plea was usury. The usury attempted to be proved on the part of the defendant, was, that the plaintiff had, in discounting the note, given in part a diamond ring, for which he charged much beyond the value. Lord Kenyon says, that he and Buller, Justice, had ruled on former occasions, that if in discounting a bill, the party discounting it gives goods in part, if these goods are of a certain ascertained value and are given at that value, it is not usury; but, that if the party discounting the bill, makes the holder of it take them at a higher value, that that shall be deemed usury; for, that a party, by substituting goods for money, shall not, by colour of the pretended value, take above the legal interest, and evade the statute.
The case of Davis v. Hardacre, 2 Camp. 375, goes still farther. That was an action by the endorsee of a bill of exchange drawn by the defendant, payable to his own order, and the defence was usury. It appeared that the defendant, being much pressed for money, applied to the plaintiff to discount the bill in question. The plaintiff re *193 fused to do so, except upon the condition that the defendant would lake a landscape in part, to be valued at 150/. The defendant then offered to prove that the picture was worth not more than 32/. But, ho was stopped by Lord Eli.enb.iuotjgti, who said, that “it. lies upon the plaintiff to prove that it is worth the 150/. When a party is com» polled to take goods in discounting a bill of exchange, I think a presumption arises that the transaction is usurious. To rebut this presumption, evidence should be given of the value of the goods, by the person who sues on the hill,?-1 And there being no such proof in that case, the plaintiff was non suited.
These cases are apposite in principle to the one before us. Í will only cite one other; Doe, on the. demise of Davidson v. Barnard, 1 Esp. Rep 11; and I refer to it to shew, that there is no difference between stock and goods In this respect.
In that case, it appeared that a person having occasion fijl* a sum of money, applied to another, who said that all his money was in the funds, and that to sell out stock at that time, would be a considerable loss, stock then standing at 73; but, that, if he would take it. at 75, he should have the sum he wanted. This was agreed to. Stock to the amount of 1500/. was taken, valued at 75, which was sold out the same day at 72£, that being the then current price. Lord Kenyon held the transaction to be clearly usurious^ and non-suited the plaintiff.
But, it is contended, that the Court could not give the second instruction asked for, without invading the province of the jury. I admit that it is the exclusive province of the jury to determine disputed facts. But, when the facts of a case shall be ascertained by a special verdict, or shall be admitted by the pleadings, it is the province of the Court to state the law arising upon those facts; and in all such cases, the question whether the facts constitute a sale or loan, or whether they constitute usury or not, is a question of law, which the Court must decide, I will cite only *194 Gibson v. Fristoe, 1 Call, 62, in our own Courts, and Marsh v. Martindale, 3 Bos. & Pull. 154, in the English Courts. The latter case is very remarkable, as shewing that when the facts of a case make usury, the quo animo with which t¡le j^ing was done, is not regarded; for, in that case, it is expressly found by the jury, that “ they believed the plaintiff did not think he was acting contrary to law.”
But, the most usual mode of obtaining the opinion of the Court on points of law, is for the party desiring it to move the Court to instruct the jury. All that is necessary for this purpose, is, for him to state his case hypothetically; and if it be pertinent to the cause, the Court is bound to pronounce the law on the case thus stated. This is no invasion of the rights of thé jury; for, if the jury shall believe that the case, as proved, is different from that stated by the party, the opinion of the Court having no application to the case as proved, can have no influence on the verdict of the jury.
I am of opinion that the Court ought to have given (£e second instruction moved for by the defendant; and that the judgment be reversed.
Judgment reversed.

 The President absent.